# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Quinonez*, 2011 IL App (1st) 092333

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. DENY QUINONEZ, Defendant-Appellee. |
| District & No. | First District, Fifth Division<br>Docket No. 1-09-2333 |
| Filed | September 2, 2011 |
| Rehearing denied | December 22, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for unlawful possession of cocaine was reversed and the cause was remanded for a new trial where the State improperly cross-examined him about his postarrest silence by asking him about his failure to tell the police that a man who was standing near him at the time attempted to put drugs in defendant's hand and in his pocket, especially when defendant's explanation of the presence of the cocaine the police seized was intrinsic to his defense and the error was compounded by the comments made in the State's closing argument. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-2767; the Hon. John T. Doody, Jr., Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on Appeal

Michael J. Pelletier, Alan D. Goldberg, and Brian E. Koch, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Rimas F. Cernius, and Michele I. Lavin, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE J. GORDON delivered the judgment of the court, with opinion.
Justices Howse and Epstein concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Deny Quinonez was found guilty of possession of less than 15 grams of cocaine and sentenced to 30 months of probation. On appeal, defendant contends that his conviction should be reversed and his cause remanded for a new trial because the State improperly cross-examined defendant about his postarrest silence, and because the trial court failed to strictly comply with the admonition requirement of Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). For the reasons discussed below, we reverse and remand.

¶ 2                                      BACKGROUND

¶ 3    Defendant was charged with possession of more than 1 but less than 15 grams of cocaine with intent to deliver in connection with an incident which took place on December 14, 2006, on the north side of Chicago. Defendant filed a motion to quash his arrest and suppress evidence, which the trial court denied and his case proceeded to a jury trial.

¶ 4    As *voir dire* began, the trial judge addressed the entire venire and explained the following:

"[Defendant], as is the case with all persons charged with crimes, is presumed to be innocent of the charge that brings him here before you. This presumption is with him now at the beginning of the trial and remains with him throughout the course of the trial and into your deliberations unless and until you individually and collectively are convinced beyond a reasonable doubt that the Defendant is guilty. It is absolutely essential as this jury is selected that each of you understand and embrace these fundamental principles, that is that all persons charged with a crime are presumed to be innocent and that it is the burden of the State, who brought this charge, to prove the Defendant guilty beyond a reasonable doubt.

The Defendant has no obligation to testify in his own behalf or to present any

-2-

evidence in his defense. The fact that the Defendant does not testify must not be considered buy [*sic*] you in any way in arriving at your verdict. However, should the Defendant elect to testify or present evidence in his behalf, you are to consider that evidence in the same manner and by the same standards as evidence presented by the State. There is no burden upon the Defendant to prove his innocence. It is the State's burden to prove the Defendant guilty beyond a reasonable doubt."

¶ 5    After the venire was sworn in, the judge asked the first panel of 28 prospective jurors the following questions:

"A Defendant in a criminal case is presumed to be innocent until a jury determines after deliberation that the Defendant is guilty beyond a reasonable doubt. Does anyone have a problem with this rule of law?

The State has the burden of proving the Defendant guilty beyond a reasonable doubt. Does anyone disagree with this rule of law?

A Defendant does not have to present any evidence at all and may rely upon the presumption of innocence. Does anyone disagree with this rule of law?

A Defendant does not have to testify. Would anyone hold the fact that a Defendant did not testify at trial against the Defendant?"

¶ 6    None of the 28 prospective jurors answered affirmatively to any of those questions. Eight jurors were chosen from that first panel. The trial court then called 22 other prospective jurors and asked them those very same questions. Again, none of the prospective jurors from the second panel answered affirmatively to any of those questions, and the remaining jurors were selected from that panel. After the jury was selected, the court heard motions *in limine* and the State then began its case-in-chief.

¶ 7    The State first called Chicago police officer David Phelan, who testified that at about 9 p.m. in the evening in question, he was on patrol with his partner, Officer Pearson. The officers were driving south on Sheffield Avenue and turned right onto School Street, when they drove past defendant and another man arguing near the intersection of the two streets.

¶ 8    The officers exited the vehicle in an area well-lit by streetlights, and as Officer Phelan approached defendant and the other man, he observed defendant, who was three to five feet away from the officer, drop a clear plastic bag on the ground. According to the officer, defendant dropped the bag between himself and Officer Phelan, who immediately recovered the bag and found that it contained six smaller plastic bags with suspected cocaine inside. Officer Phelan stated that after he recovered the bag, he "immediately placed [defendant] in custody," and after performing a custodial search, the officer found in defendant's jacket pocket another plastic bag, which contained seven smaller clear plastic bags of suspected cocaine. After defendant was arrested, the officers transported him to the police station, where Officer Phelan inventoried the items recovered from defendant.

¶ 9    On cross-examination, defense counsel asked Officer Phelan at what time "this alleged occurrence" happened, which the officer replied that it was 8:55 p.m. When asked at what time he placed defendant under arrest, the officer replied that it also happened at 8:55 p.m. The officer then acknowledged that the arrest was "pretty immediate." Officer Phelan did not see the other man on the scene drop anything, nor did he recover anything from that man.

¶ 10      The State then called Officer Pearson, who testified that he conducted a pat-down search of the man who had been arguing with defendant but did not recover anything from him. Officer Pearson was not asked on direct examination whether he observed defendant drop anything or whether he saw Officer Phelan recover a bag from defendant's jacket. However, although he was not cross-examined with regard to his knowledge of the origin of the plastic bags, the officer attested that he recognized the two bags, for which he generated reports, as the bag recovered from the ground and the bag recovered from defendant's jacket.

¶ 11      Next, the State called David Boler, a forensic scientist for the Illinois State Police crime laboratory, who testified that the substance contained in the plastic bags that were recovered from the ground and from defendant's jacket tested positive for cocaine. After the State rested, the defense made a motion for directed verdict, which the trial court denied.

¶ 12      Defendant testified on his own behalf. He stated that in the evening in question, he had plans to meet with his landlady at a restaurant near Clark and Sheffield. When he arrived, defendant realized that he did not have his wallet, so he left the restaurant to get his wallet from his car, which was parked on Sheffield Avenue.

¶ 13      Defendant stated that as he walked down Sheffield, he was approached by a strange man, whom he described as African-American, in his thirties, dirty and disheveled. According to defendant, that man initially asked him for spare change, and after defendant told him that he did not have any, the man grabbed defendant's arm and kept walking alongside him. Defendant testified that he turned left on School Street, which was not where he had parked his car, because he did not want that man to know where his car was parked. After defendant reached the elevated tracks above School Street, he turned around and began walking toward Sheffield. According to defendant, the man was touching defendant's jacket. Defendant stated that he did not push or yell at the man or call out for help because he did not feel threatened by the man, who was only bothering him. Defendant denied that he and the man were arguing at any point.

¶ 14      As defendant approached the intersection of Sheffield and School Street, he heard a car screeching, then saw an unmarked car parked next to him. Defendant stated that there were no lights above the area where he was standing. Two police officers exited the car and approached defendant and the other man with flashlights. One of the officers grabbed the other man and took him to the trunk of the car, while the other officer grabbed defendant and placed him by a fence. Defendant testified that the officers handcuffed both men, and he denied that he either dropped a bag on the ground or that he had the seven plastic bags of cocaine in his pocket. According to defendant, the incident involving the police officers happened fast and they put defendant in a police car within 10 seconds of handcuffing him.

¶ 15      On cross-examination, defendant acknowledged that he had previously testified, at a hearing on his motion to quash his arrest and suppress evidence, that the man who followed him had also tried to sell him drugs. Defendant then explained that he did not know whether the man was trying to sell him drugs, but he stated that the man told him "I have something good for you," and "I got a good deal." Defendant further stated that he did not know whether the man had gone into his pockets or put anything in his jacket while he walked alongside defendant. He acknowledged that at the hearing, he had testified that the man had

been trying to put bags with some kind of substance into defendant's hands and pockets while the man followed defendant. Defendant explained, however, that at the time of trial, he could no longer recall whether the man had, in fact, tried to put bags in his hands and pockets. When asked about the point in time when the man tried to put something in his pocket, defendant stated that he tried it twice, once on Sheffield and once on School Street, but defendant could not feel whether he actually had managed to put anything in his jacket pocket. Additionally, defendant stated that the man put some kind of package in defendant's hand, and defendant gave it back to him.

¶ 16    Continuing to cross-examine, the State asked defendant, "At the point the police arrive on the scene and they stop you and they stop this individual, this strange man, you don't tell the police what just happened to you from the time you got out of the restaurant until they got on the scene, do you?" Defendant answered "no." Defense counsel objected to the State's question on the grounds that it was "post-arrest," and the trial court overruled the objection. The State then asked defendant, "The police get on the scene, you've encountered a strange man, you say the strange man is putting a chunky substance in your hand and in your pocket, you don't tell them, do you?" Defendant again answered "no." Defense counsel objected again and asked for a sidebar. The trial court sustained the objection "as to what [the State] just asked, the chunky substance," and denied the sidebar. The State then asked defendant, again, whether he told the police that the man had put something in his hand or pocket, which defendant, again, answered negatively. Defendant acknowledged that the police officers recovered a package from the right outer pocket of his jacket, but he stated that he did not know what it was.

¶ 17    Sylvia Szafran, defendant's landlady, corroborated defendant's testimony. Szafran testified that she followed defendant after he left the restaurant, and when she was about 40 feet behind defendant, she saw a man grab him under his arm and walk with him. She stated that defendant tried to release himself from the other man, who continued to hold him. On direct examination, Szafran stated that she did not call 911 because she did not think that defendant was in any danger, but she further testified that she did not call out to defendant because she was "terrified" and did not know what to do. She later stated, on cross-examination, that she had heard a rumor that defendant "likes boys," and she continued to follow defendant to find out if that man was his date.

¶ 18    Szafran further stated that when defendant turned left onto School Street, she stopped at the corner across the street from the two men. She then saw a car drive up to defendant and the other man and saw a police officer grab defendant while the other grabbed the other man. According to Szafran, the officers let the other man go a few minutes later, while defendant was handcuffed and placed in a car. She later testified, on cross-examination, that she did not know that defendant was arrested until two or three o'clock the next morning.

¶ 19    Further, Szafran testified that she did not see defendant or the other man drop anything. She further noted that she could observe the incident from her vantage point because there was a light at the corner. Szafran stated, on cross-examination, that she never went up to the police officers to tell them what she saw the other man do because it happened quickly, and she thought that "maybe it was dating." Additionally, Szafran acknowledged that she did not go to the police station to tell them what happened.

¶ 20    During the State's rebuttal at closing arguments, the State noted:

"Officers came into contact with an individual. They stopped the individual, ladies and gentlemen. They stopped the individual along with the defendant.

Perfect timing to tell someone that someone planted something in my jacket. Perfect timing to tell the officers, who serve and protect, hey, this guy's been harassing me, this guy's been pestering me, this guy's planting drugs on me. ***

None of that was done when the officers had the second individual there. Why? Because the second individual didn't do that. He didn't plant drugs on the defendant."

¶ 21    The jury subsequently found the defendant guilty of the lesser included offense of possession of a controlled substance, less than 15 grams of cocaine. On March 4, 2009, defendant filed a posttrial motion in which defendant claimed, *inter alia*, that he was denied due process and equal protection of the laws. On May 20, 2009, he filed a supplemental motion for a new trial in which he argued, *inter alia*, that his constitutional right against self-incrimination was violated when the State was allowed to ask defendant, at trial, whether he told the police that the other man at the scene had tried to put drugs in defendant's hand and pockets. The trial court denied the motion and ruled that the State's questions at trial referred to defendant's actions prior to his arrest and were, therefore, proper. The trial court then sentenced defendant to 30 months of probation.

¶ 22                                    ANALYSIS
¶ 23                  A. The State's Use of Defendant's Postarrest Silence
¶ 24    On appeal from the trial court's judgment, defendant first contends that his conviction should be reversed and his cause remanded for a new trial because the State improperly cross-examined him about his postarrest silence by asking him whether he told the police officers that the man standing near him had tried to put drugs in his hand and pocket. He further maintains that the error was not harmless because the State's improper impeachment of defendant with his postarrest silence undermined his credibility where the outcome of the case depended on whether the jury believed defendant's testimony or that of the officers who testified for the State. Additionally, defendant contends that the prejudice resulting from that error was compounded when the State referred to defendant's postarrest silence during closing arguments.

¶ 25    We initially note, and the parties agree, that the federal constitution does not purport to prohibit the use of pre-*Miranda* silence, including silence following a defendant's arrest but before receiving *Miranda* warnings. Admittedly, the United States Supreme Court held in *Doyle v. Ohio*, 426 U.S. 610, 617-20 (1976), that it was a violation of the due process clause of the fourteenth amendment for the State to impeach a defendant using evidence that defendant was silent following his arrest, after he was advised of his *Miranda* rights. The Court reasoned that since the *Miranda* warnings carry the implicit assurance that his silence will carry no penalty, it would be fundamentally unfair to allow a defendant's post-*Miranda* silence to impeach his trial testimony. *Doyle*, 426 U.S. at 612, 618. However, the Supreme Court later held that the prohibition applies only to a defendant's silence after being advised of his *Miranda* rights. *Fletcher v. Weir*, 455 U.S. 603, 607 (1982) (*per curiam*). In doing so,

it found that states were free to formulate their own rules with respect to defendant's silence before arrest (*Jenkins v. Anderson*, 447 U.S. 231, 238 (1980)), as well as after arrest but before receiving *Miranda* warnings (*Fletcher*, 455 U.S. at 607).

¶ 26    In this case, since there is no evidence in the record that defendant received his *Miranda* warnings during the incident in question, both parties agree that federal constitutional law prohibiting the State from impeaching defendant by referring to his silence after the police officers arrived is not invoked. However, that is not dispositive of defendant's argument because, apart from any constitutional concerns, Illinois evidence law prohibits impeachment of a criminal "defendant with his or her postarrest silence, regardless of whether the silence occurred before or after the defendant was given *Miranda* warnings." *People v. Clark*, 335 Ill. App. 3d 758, 762-63, 781 N.E.2d 1126, 1129-30 (2002). The Illinois principle that prohibits impeachment of a defendant with his postarrest, pre-*Miranda* silence is based on our supreme court's decisions in *People v. Lewerenz*, 24 Ill. 2d 295, 299, 181 N.E.2d 99, 103 (1962), and *People v. Rothe*, 358 Ill. 52, 57, 192 N.E. 777, 779 (1934). See, *e.g.*, *Clark*, 335 Ill. App. 3d at 763, 781 N.E.2d at 1129. Our supreme court held that "an accused is within his rights when he refuses to make a statement [at the time of his arrest], and the fact that he exercised such right has no tendency to prove or disprove the charge against him, thus making evidence of his refusal neither material or relevant to the issue being tried." *Lewerenz*, 24 Ill. 2d at 299, 181 N.E.2d at 101 (citing *Rothe*, 358 Ill. at 57, 192 N.E. at 779). Since both decisions predate *Miranda v. Arizona*, 384 U.S. 436 (1966), the prohibition which they set forth under Illinois evidence law does not depend on whether defendant's postarrest silence occurred before or after he was advised of his *Miranda* rights. *Clark*, 335 Ill. App. 3d at 762-63, 781 N.E.2d at 1129 (quoting *People v. McMullin*, 138 Ill. App. 3d 872, 876-77, 486 N.E.2d 412, 415 (1985)). The language of relevancy and materiality utilized by our supreme court in *Lewerenz* and *Rothe* indicates that the Illinois rule which prohibits impeachment with defendant's postarrest silence is based on evidentiary principles, rather than constitutional law. *Id*. Therefore, the rule is unaltered by federal constitutional cases which found that the use of a defendant's postarrest, pre-*Miranda* silence does not violate due process. *Id*.; see *Fletcher*, 455 U.S. at 607; see also *People v. Homes*, 274 Ill. App. 3d 612, 619-20, 654 N.E.2d 662, 668-69 (1995) (acknowledging where the State introduces evidence of a defendant's postarrest, pre-*Miranda* silence is not a constitutional violation, but it is prohibited by the Illinois rule); *cf. People v. Givens*, 135 Ill. App. 3d 810, 823-24, 482 N.E.2d 211, 220-21 (1985) (finding that the use of a defendant's postarrest, pre-*Miranda* silence does not violate due process, but not addressing the issue of whether it violates any other evidentiary principles).

¶ 27    Thus, the Illinois evidentiary rule generally prohibits impeachment of a criminal defendant with his postarrest silence, regardless of whether it occurred before or after he was given *Miranda* warnings, because under those circumstances, that silence is not considered relevant or material. *Clark*, 335 Ill. App. 3d at 763, 781 N.E.2d at 1129. However, courts have held that there are two exceptions to the general rule, where that postarrest silence will be considered relevant. *McMullin*, 138 Ill. App. 3d at 877, 486 N.E.2d at 416. Pursuant to those exceptions, a defendant's postarrest silence may be used to impeach his trial testimony: (1) when defendant testifies at trial that he made an exculpatory statement to the police at the

time of his arrest; and (2) when he makes a postarrest statement that is inconsistent with his exculpatory trial testimony. *People v. Simmons*, 293 Ill. App. 3d 806, 811, 689 N.E.2d 418, 422 (1998); see also *McMullin*, 138 Ill. App. 3d at 877, 486 N.E.2d at 416. However, in contrast to a defendant's postarrest silence, his silence prior to arrest may properly be used by the State to impeach his trial testimony under Illinois law. *People v. Graves*, 142 Ill. App. 3d 885, 889-90, 492 N.E.2d 517, 521 (1986).

¶ 28    Here, defendant argues that when the State questioned him at trial as to whether he told the police officers about the other man's actions, thus referred to the period after his arrest because the officers arrested defendant almost immediately after they arrived on the scene. Thus, defendant contends that the State attempted to use his postarrest silence, notwithstanding the evidentiary prohibition against such use, as enunciated in *Lewerenz* and *Rothe*. Defendant further contends that the State's questions do not fall within either of the exceptions to the prohibition against the use of his postarrest silence for impeachment because there is no evidence that defendant made any statements to the police at the time of his arrest that were inconsistent with his trial testimony, and because defendant did not testify that he made an exculpatory statement to the police when they arrested him.

¶ 29    The State responds that its questions did not violate the prohibition because they referred to defendant's silence prior to his arrest. According to the State, its questions referred only to defendant's failure to flag the police for help before the officers stopped and to ask them for help once they approached defendant and the other man on the street. Alternatively, the State contends that even if its questions referred to defendant's postarrest silence, they would fall under an exception to the evidentiary rule because, contrary to defendant's assertion, his silence at the time of his arrest is manifestly inconsistent to defendant's testimony at trial, because if that man had, in fact, been harassing defendant, he would have told that to the officers when they arrived at the scene. In a related argument, the State contends that its questions and comments did not refer to defendant's silence, but only to his actions in failing to ask the police for help under circumstances where a reasonable person would have asked for assistance.

¶ 30    We first address the issue of whether the State's questions referred to defendant's postarrest silence or merely his silence prior to arrest. This court has held that, for the purposes of the constitutional prohibition against introduction of a defendant's postarrest, post-*Miranda* silence, a defendant is deemed arrested when he is restrained by police officers and placed in a squad car. *People v. Adams*, 102 Ill. App. 3d 1129, 1132, 430 N.E.2d 267, 271 (1981). In that case, the court found that although defendant was not formally charged with a crime until later that night at the police station, the prohibition became operative when defendant was restrained at the scene, placed in a squad car and advised of her *Miranda* rights. *Adams*, 102 Ill. App. 3d at 1132, 430 N.E.2d at 271 (citing *People v. Creach*, 79 Ill. 2d 96, 100-01, 402 N.E.2d 228, 230 (1980), and *People v. Wipfler*, 68 Ill. 2d 158, 166, 368 N.E.2d 870, 873 (1977)). In doing so, the court relied on *Creach*, in which our supreme court found that the defendant was effectively arrested when an officer frisked him and told him that he would have to go to the police station, where, according to the officer's own testimony, he took defendant into custody in that encounter and he was not free to leave. *Creach*, 79 Ill. 2d at 100-01, 402 N.E.2d at 230; see also *Simmons*, 293 Ill. App. 3d at 808-

12, 689 N.E.2d at 420-23 (finding that the State referred to defendant's postarrest silence when the prosecutor asked defendant whether he denied owning the gun found in his seat after he was pulled out of the vehicle and handcuffed); *cf. Graves*, 142 Ill. App. 3d at 888-90, 492 N.E.2d at 520-21 (finding that the State's questions properly referred only to defendant's prearrest silence where the prosecutor asked whether he contacted the police to tell them about his exercise of self-defense three to four days before he surrendered himself to the police).

¶ 31 In this case, as previously noted, the State specifically asked defendant on cross-examination, "At the point the police arrive on scene and *they stop you* and they stop this individual, *** you don't tell the police what just happened to you from the time you got out of the restaurant until they got on the scene, do you?" (Emphasis added.) Defendant answered that he did not, and the State then asked, "The police get on the scene, you've encountered a strange man, you say the strange man is putting a chunky substance in your hand and in your pocket, you don't tell them, do you?" Defendant, again, answered that he did not, and the State, again, asked defendant whether he told the officers that the man had put something in his pocket, which defendant again said that he did not.

¶ 32 Additionally, Officer Phelan's testimony indicates that he was still approaching defendant from no more than five feet away when defendant dropped a bag, which the officer immediately recovered. Further, the officer stated that he saw that the bag contained smaller bags of suspected cocaine, and he "immediately placed [defendant] in custody." According to the officer, both the "occurrence" and defendant's arrest took place at 8:55 p.m. that evening, and he acknowledged that the arrest was "pretty immediate." Thus, Officer Phelan's testimony indicates that when he put defendant on the fence and handcuffed him, he was, in fact, arresting him (*Adams*, 102 Ill. App. 3d at 1132, 430 N.E.2d at 271) and that such arrest was the only time he "stopped" defendant. Further, defendant testified that after the officers exited their car, one of them grabbed defendant, put him against a fence and handcuffed him. He stated that once the officers came up to him, everything happened fast. Consequently, defendant's testimony appears to indicate that his arrest was instantaneous in that there was no delay between the time he was stopped and the time he was arrested. Defendant stated that when he was first approached by an officer, he was almost immediately placed on the fence and handcuffed, which, according to Officer Phelan, was an arrest. Therefore, when the State asked defendant about what he told the officers when they "stopped" him, it appears to refer to the point in time when Officer Phelan put defendant on the fence and handcuffed him, effectively arresting him. Even if there was a short period between the time the officers first exited the car and approached defendant and the time Officer Phelan stopped him, the State's question appears to refer specifically to defendant's silence after he was stopped, which, according to the officer's testimony, was the time of his arrest.

¶ 33 Furthermore, none of the State's questions with regard to whether defendant informed the police officers that the other man had been harassing him were limited in their scope solely to the short interval between the time the officers arrived and the time that they stopped defendant. Since the testimony of both Officer Phelan and defendant indicates that the arrest occurred almost immediately after the officers arrived on the scene, we conclude that those questions were made in reference to defendant's silence after his arrest.

Accordingly, the State's questions and comment on rebuttal did, in fact, pertain to his postarrest silence and were, therefore, improper.

¶ 34　　We now turn to the State's contention that those questions were proper because they fall within one of the two exceptions referred to earlier, under which postarrest silence would be admissible, namely: (1) where defendant falsely testifies at trial that he made the same exculpatory statement to the police at the time of his arrest; and (2) where he makes a postarrest, pretrial statement that is manifestly inconsistent with his trial testimony. The State contends that defendant's failure to tell the police officers what the other man had done falls within the second exception, in that his silence was inconsistent with his exculpatory testimony at trial. In that regard, we also address the State's related contention in which it characterizes defendant's failure to ask for help as an act, instead of silence, and argues that since its questions and comments refer only to defendant's actions, the prohibition against the use of postarrest silence is inapplicable. The State maintains, in support of both arguments, that if the other man had, in fact, been harassing defendant and trying to put objects in defendant's hand and pocket, defendant would have asked the police for help. Both contentions lack merit.

¶ 35　　As noted above, the Illinois evidentiary rule allows the State to use a defendant's postarrest failure to tell police his exculpatory story when the defendant makes statements after arrest that are manifestly inconsistent with his trial testimony. *McMullin*, 138 Ill. App. 3d at 877, 486 N.E.2d at 416. Accordingly, where a defendant makes no statements to the police before trial, there is no such manifest inconsistency between his trial testimony and any statements made before trial. *People v. Moody*, 199 Ill. App. 3d 455, 465, 557 N.E.2d 335, 342 (1990). In *Moody*, 199 Ill. App. 3d at 465, 557 N.E.2d at 342, where defendant refused to answer any of the police officer's questions, and testified for the first time at trial that a third party had threatened the victim's life, the court held that the State improperly commented on his postarrest silence because it had no statements " 'manifestly inconsistent' " with defendant's exculpatory testimony that could be used for impeachment.

¶ 36　　Similarly, in *Homes*, 274 Ill. App. 3d at 616-20, 654 N.E.2d at 666-69, defendant's juvenile brother was silent during a police interrogation after his own arrest and later testified at trial that it was him, and not defendant, who committed the shooting in question. The court held that his silence was not sufficiently inconsistent with his trial testimony to fall within the exception to the evidentiary rule against the use of postarrest silence for impeachment. *Homes*, 274 Ill. App. 3d at 620-21, 654 N.E.2d at 668-69. In doing so, the court noted that the silence of an accused after arrest is so ambiguous that it lacks the requisite inconsistency with his exculpatory trial testimony, and there were many reasons why defendant's brother would not tell the police that defendant was not involved in the crime, such as reliance on his constitutional privileges. *Id*. The court further noted that while it is appropriate for the State to cross-examine a defendant's alibi witnesses, who were not themselves arrested, with regard to their failure to come forward before trial, that principle does not apply to the use of a witness's postarrest silence for impeachment. *Id*. at 620. Thus, unlike a defendant's postarrest statements, his failure to speak after arrest, whether it is characterized as silence or as a failure to act, is not sufficiently inconsistent with that defendant's exculpatory testimony to be properly used for his impeachment.

¶ 37    In this case, as in *Moody*, there is nothing in the record to indicate, nor do the parties contend, that defendant made any statements to the police officers at any time before trial, and the State merely contends that defendant's failure to ask for help is, in and of itself, inconsistent with his trial testimony. However, defendant testified that he did not ask for help because he did not feel threatened by the other man, that he did not know whether the man had managed to put anything in his pocket, and that when Officer Phelan took something from defendant's pocket, defendant did not know what that was. Therefore, whether defendant's failure to ask the officers for help is characterized as silence or failure to act, as in *Homes*, it is too ambiguous to be properly used against him for impeachment purposes. Similarly to the defendant in *Homes*, there were several reasons why defendant in this case would choose not to ask the police for help, including possible reliance on his constitutional rights. In addition, since defendant did not make any statements to the police at the time of his arrest, there were no manifestly inconsistent pretrial statements that the State could have properly used for impeachment purposes. Additionally, with respect to the attempt to impeach defendant's failure to ask for help, we note that since nothing indicates that defendant testified at trial that at the time of his arrest, he told the police officers that the man had tried to put something in his hand and jacket, we conclude that the State's questions do not fall under any exception to the Illinois rule and were, therefore, improper.

¶ 38    The State's attempt to distinguish this case from *Homes*, 274 Ill. App. 3d at 616-20, 654 N.E.2d at 666-69, is misplaced. Admittedly, the statement that the witness in *Homes* failed to give the police after his own arrest would have exculpated that witness's brother and not himself, while defendant in this case failed to tell the police facts that would have exculpated his own crime, namely, why there was a bag of cocaine in his pocket. However, if anything, as shall be postulated in our discussion of *Conley*, that distinction would have indicated a more relaxed rule in *Homes*, where the witness was a third party, while in this case the witness was defendant himself. Consequently, the prohibition against postarrest silence proffered in *Homes* would, *a fortiori*, be applicable here.

¶ 39    Furthermore, the State's reliance on *People v. Conley*, 187 Ill. App. 3d 234, 244, 543 N.E.2d 138, 145 (1989), also lacks merit. In that case, where the court held that a witness's failure to speak is admissible to discredit his testimony under circumstances where a reasonable person would have spoken up, the witnesses in question were not themselves criminal defendants. *Conley*, 187 Ill. App. 3d at 238, 543 N.E.2d at 140-41. In contrast, defendant in this case was impeached with his silence after his own arrest, and the principle that applies to the impeachment of other witnesses with their failure to speak is inapplicable to a defendant's postarrest silence. *Homes*, 274 Ill. App. 3d at 620, 654 N.E.2d at 668-69; see also *People v. Long*, 316 Ill. App. 3d 919, 930-31, 738 N.E.2d 216, 224 (2000) (in the context of post-*Miranda* silence, the principle that allows the impeachment of witnesses with their failure to speak does not apply to criminal defendants).

¶ 40    We recognize that although the State's questions and remarks made during rebuttal were improper, the judgment will not be reversed if the error was harmless, namely, it did not cause prejudice to defendant. *People v. Johnson*, 208 Ill. 2d 53, 115, 803 N.E.2d 405, 440-41 (2003). Thus, defendant's conviction may be affirmed if the reviewing court determines, after examining the record, that the error was harmless beyond a reasonable doubt. *People v.*

*Arman*, 131 Ill. 2d 115, 127, 545 N.E.2d 658, 664 (1989). Defendant contends that the error was not harmless because the evidence presented at trial was close and that the verdict depended on the credibility of the State and the defense witnesses, who offered different versions of the events. According to defendant, the State's improper questions undermined defendant's credibility, which was a central issue in this case, and the error was compounded by the State's comments during closing argument that once the police stopped defendant, it was the "perfect timing" to tell them that the other man had planted something in his jacket, and that the reason why defendant did not say anything was because the other man had not, in fact, placed anything on him. The State, on the other hand, posits that any possible error would have been harmless because it contends that the evidence of defendant's guilt presented at trial was overwhelming. The State maintains that defendant's testimony that the other man placed drugs in defendant's hand and pocket was not believable and that the officers' testimony, combined with the drugs found in front of defendant and in his pockets, would have been sufficient to convict defendant in the absence of the State's improper questions and comments on rebuttal. We agree with the defendant. See *Moody*, 199 Ill. App. 3d at 465, 557 N.E.2d at 342; *McMullin*, 138 Ill. App. 3d at 873-77; see also *People v. Naylor*, 229 Ill. 2d 584, 606-10, 898 N.E.2d 653, 667-70 (2008).

¶ 41    In *Moody*, 199 Ill. App. 3d at 465, 557 N.E.2d at 342, the court found that where a defendant's own explanation of the events was of significant import to his defense, improper comments with regard to his postarrest silence were not harmless error. In that case, the State presented testimony from a police officer and defendant's cousin that defendant admitted to shooting the victim, and evidence that defendant had gun residue in his hands shortly after the shooting. *Moody*, 199 Ill. App. 3d at 458-61, 557 N.E.2d at 337-39. As previously noted, defendant's defense included his own testimony of his whereabouts at the time of the crime, that a third party had threatened the victim's life and that he did not admit to shooting the victim. *Moody*, 199 Ill. App. 3d at 458-61, 557 N.E.2d at 337-39. The court held that the State's references to defendant's postarrest silence were not harmless because they seriously damaged his credibility and undermined his alibi, which were critical to his defense. *Moody*, 199 Ill. App. 3d at 465, 557 N.E.2d at 342; accord *McMullin*, 138 Ill. App. 3d at 873-77, 486 N.E.2d at 414-15 (improper references to defendant's postarrest silence were not harmless where the verdict depended on whether the jury believed defendant's testimony that he was unaware that the co-defendants were committing burglary); see also *Naylor*, 229 Ill. 2d at 606-10, 898 N.E.2d at 667-70 (evidence was closely balanced where police officers testified that they purchased drugs from defendant and a third officer arrested defendant, and defendant's testimony that he was arrested in a drug raid was consistent with the officers' testimony).

¶ 42    In this case, the State presented Officer Phelan's testimony that he observed defendant drop a package on the ground from three to five feet, and that a custodial search revealed that he had another bag of cocaine in his jacket pocket. There was no testimony forthcoming from Officer Pearson that he observed defendant drop a bag on the ground or that he saw Officer Phelan recover anything from defendant's pocket. Further, Officer Phelan acknowledged that there was another individual next to defendant at the time of the incident. Defendant testified that the man standing near him had been following him, may have been trying to sell him

-12-

drugs, and tried to put objects in defendant's hand and jacket pocket. While defendant denied having dropped a bag on the ground, he testified that he gave back the object that the man tried to put in his hand. Szafran, whose relationship to defendant was described only as that of being his landlady, corroborated defendant's testimony, stating that she was an observer and that she saw that man follow defendant in the manner that defendant described, and did not see defendant drop anything on the ground. Defendant's explanation of how the drugs were in his jacket and denial that he dropped the bag were intrinsic to his defense. Accordingly, the improper use of defendant's postarrest silence to impeach him cannot be deemed to have been harmless.

¶ 43        B. The Trial Court's Compliance With Illinois Supreme Court Rule 431(b)

¶ 44        We next address defendant's contention that the trial court violated Illinois Supreme Court Rule 431(b) for failing to ask the prospective jurors whether they understood the principles enumerated in the rule. As previously discussed, the trial court, in giving its admonitions, first explained to the prospective jurors that defendant is presumed innocent and asked whether anyone "ha[d] a problem" with that principle, then stated that the State has the burden of proving defendant guilty beyond a reasonable doubt and asked if anyone "disagreed" with that rule. The trial court then explained that the defendant does not have to present any evidence and again asked if anyone "disagreed" with that rule. Finally, the court stated that defendant does not have to testify and asked whether anyone would hold it against defendant if he did not testify. Defendant now maintains that when the trial judge made the admonitions to the prospective jurors, he ascertained only that the venire members accepted the principles, but failed to question them on whether they understood those principles.

¶ 45        The State responds that defendant has forfeited this issue by failing to object at trial and to raise the issue in a written posttrial motion as required to preserve an issue for review. *People v. Piatkowski*, 225 Ill. 2d 551, 564, 870 N.E.2d 403, 409 (2007). Defendant acknowledges those omissions but contends that the forfeiture rule should not be applied to this case because if counsel were required to object to a violation of Rule 431(b) to preserve the error, that would be inconsistent with the purpose of the rule, as amended, which requires the trial court to question the venire *sua sponte* on the four enumerated principles. Alternatively, defendant contends that the issue should be reviewed under both prongs of the plain error rule.

¶ 46        Since we now remand this case to the trial court by reason of the erroneous admission of defendant's postarrest silence, we find that there is no necessity to proceed with a plain error analysis to determine whether the trial court's handling of the Rule 431(b) admonitions is reviewable under the plain error doctrine. However, regardless of its current reviewability under the plain error doctrine, it may be useful to discuss whether the trial court's handling of those admonitions was erroneous, since the trial court may well revisit those admonitions on retrial upon remand. Thus, we review *de novo* the issue of the trial court's compliance with Rule 431(b). *People v. Thompson*, 238 Ill. 2d 598, 606, 939 N.E.2d 403, 409 (2010).

¶ 47        The rule requires the trial court to ask each prospective juror, individually or in a group, whether he or she understands and accepts that (1) defendant is presumed innocent of the

charge against him; (2) before defendant can be convicted, the State must prove him guilty beyond a reasonable doubt; (3) defendant is not required to offer any evidence on his behalf; and (4) defendant's failure to testify cannot be held against him. Ill. S. Ct. R. 431(b) (eff. May 1, 2007). As our supreme court recently noted, the rule mandates a "specific question and response process," in which the jurors, either individually or in a group, are asked whether they understand and accept the enumerated principles. *People v. Thompson*, 238 Ill. 2d 598, 607, 939 N.E.2d 403, 409-10 (2010).

¶ 48    Defendant does not dispute that the trial court addressed each of the four principles or that the court ascertained whether the prospective jurors accepted the principles. Rather, he contends that the trial court failed to ascertain whether they understood those principles because it did not use the word "understand" but, instead, asked the jurors whether they "had a problem" with the first princple, if they "disagreed" with the second and third, and whether they would hold defendant's failure to testify against him. For the following reasons, we find that the court's questioning was in compliance with Rule 431(b).

¶ 49    This court has held that Rule 431(b) does not dictate a particular methodology for establishing the prospective jurors' understanding or acceptance of those principles. *People v. Strickland*, 399 Ill. App. 3d 590, 603-04, 926 N.E.2d 744, 756 (2010); *People v. Ingram*, 409 Ill. App. 3d 1, 12, 946 N.E.2d 1058, 1068-79 (2011). In doing so, we have noted that there is no requirement that the specific language of the rule be used. *Strickland*, 399 Ill. App. 3d at 604, 926 N.E.2d at 756. For example, in *Ingram*, 409 Ill. App. 3d at 12, 946 N.E.2d at 1068-79, this court held that the trial court met the requirements of Rule 431(b) where it admonished the potential jurors of the four principles, then asked them whether they had any " 'difficulty or quarrel' " with each of the four principles. Similarly, in *Strickland*, 399 Ill. App. 3d at 603-04, 926 N.E.2d at 756, this court found compliance where the court asked the venire whether each juror would hold defendant's decision against him if he decided not to testify.

¶ 50    In this case, there is no substantive difference from *Ingram* and *Strickland*, since the court in this case asked the venire members if they "had a problem" with the presumption that defendant is innocent, if they "disagreed" with the State's burden of proving defendant guilty, and if they would hold defendant's failure to testify "against" him. Although the court did not use the precise language of Rule 431(b), the words that it did use clearly indicated to the prospective jurors that the court was asking them, not only whether they accepted the principles enumerated in the rule, but also whether they understood them. As a result, we find no error.

¶ 51    For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and remand this cause for a new trial.

¶ 52    Reversed and remanded.